137 So.2d 201 (1962)
ORANGE BREVARD PLUMBING & HEATING Company, Appellant,
v.
Henry J. LA CROIX and Helen P. LaCroix, Appellees.
No. 31270.
Supreme Court of Florida.
January 31, 1962.
Gilbert Bentley, Orlando, for appellant.
Sanders, McEwan, Schwarz & Mims, Orlando, for appellees.
HOBSON, Justice.
On May 22, 1959, the appellant, who was the plaintiff in the action below, obtained and recorded a judgment in the circuit court for Orange County, Florida against the appellees in the sum of $5,972.18. At the time the judgment was rendered and for some three and one-half years prior thereto the appellees owned as tenants by the entirety and occupied as their homestead certain real property in Orange County, Florida. On July 22, 1959, the appellees sold this homestead property. The attorneys for the purchaser, having discovered the aforementioned judgment of record, withheld from the appellees $6,000.00 of the purchase price of the property pending a determination that it was homestead property as of the date of sale.
While the attorneys for the purchaser were thus holding the sum of $6,000.00 the appellant caused to be issued by the Circuit Court of Orange County in September 1959 a writ of garnishment against the attorneys. Thereafter the garnishees filed their answer in which they admitted holding the sum of $6,000.00 for and on behalf of the appellees. Subsequently the appellees filed a motion to dissolve the writ of garnishment on the ground that the sum of $6,000.00 held by the garnishees was exempt from forced levy, *202 since that sum represented proceeds of the sale of homestead property. In support of its motion the appellees filed an affidavit of appellee Henry J. LaCroix, the contents of which are set forth herewith:
"I, Henry J. LaCroix, having first been duly sworn upon oath by the undersigned officer, depose and say as follows:
"1. That I am one of the Defendants in the above style [sic] cause and the other Defendant, Helen P. LaCroix, is my wife.
"2. That on the 22nd day of May, 1959, and for approximately three and one-half (3 1/2) years prior thereto my wife and I owned Lot 3, Stonehurst Estates as per plat thereof, recorded in Plat Book ____, Page ____, of the Public Records of Orange County, Florida. Said property is located in Orange County outside the corporate limit of any municipality. Said property is less than one-half acre in size. The street address of said property is 1807 Stonehurst Drive, Winter Park, Florida.
"3. Located upon said property is a single family residence and on the aforesaid date and during the aforesaid period my wife and I resided upon said property with our children, Patricia B. and Henry J. LaCroix, Jr. During all said time we have continuously resided in Florida and on said property with the intention of making Florida our permanent home.
"4. During the latter part of 1958 and the early part of 1959, I was self-employed in the business of constructing houses and the business failed to prosper and it was necessary that I discontinue said business at a time when I was heavily indebted. As a result of business failure, it became necessary for me to sell the above described property because I could no longer afford to maintain a house as large and as expensive. Said house had a market value of approximately $25,000.00 and an area of 2,000 square feet. In July I listed the house for sale with the intention of selling it and purchasing a smaller and less expensive home for my family. On the 15th day of July, 1959, I entered into a contract to sell the house and the transaction was closed on July 22, 1959. The attorney for the purchaser in examining title of said property discovered the judgment of record in the amount of $5,972.18 obtained by Orange Brevard Plumbing & Heating Company against me and my wife and withheld the sum of $6,000.00 from the proceeds of the sale pending a determination that the property was homestead on date of said sale.
"5. On the date of the sale and on date of the closing my wife and I were residing on the property and continued to reside there until approximately August 15, 1959, when we rented a house at 514 Dunblane Street, Winter Park, Florida, where we intended to reside until we could find a suitable house to purchase for our home.
"I intend to purchase a home with the funds in the hands of Winderweedle & Hunter when they are paid to me.
"Further affiant sayeth not."
A hearing was held before the circuit court on the motion to dissolve the writ of garnishment, and it was agreed by the parties that the issues should be determined on the basis of the affidavit of Henry J. LaCroix. Thereafter the court entered an order dissolving the writ of garnishment and finding that the sum of $6,000.00 held by the garnishees was exempt from forced levy under the Constitution and laws of the State of Florida.
The appellant then appealed to the District Court of Appeal, Second District. The district court, however, noting that the circuit court in its order had construed a controlling provision of the Constitution *203 and that therefore exclusive jurisdiction of the appeal rested with the Supreme Court, ordered the appeal transferred to this court pursuant to Rule 2.1, subd. a(5) (d), Florida Appellate Rules, 31 F.S.A.
The question with which we are faced, therefore, is whether the exemption of homestead property from forced sale which is accorded by Article X, Section 1 of the Florida Constitution, F.S.A., extends also to the proceeds of a voluntary sale of a homestead when it is intended in good faith that such proceeds are to be reinstated in a new homestead.
Article X, Section 1 of the Florida Constitution provides in part:
"A homestead to the extent of one hundred and sixty acres of land, or the half of one acre within the limits of any incorporated city or town, owned by the head of a family residing in this State, together with one thousand dollars worth of personal property, and the improvements on the real estate, shall be exempt from forced sale under process of any court, and the real estate shall not be alienable without the joint consent of husband and wife, when that relation exists."
The specific question raised herein is one of the first impression before this court. There are, however, two Florida cases which are sufficiently related to the matter at hand to merit our attention. In Hill v. First National Bank, 79 Fla. 391, 84 So. 190, 20 A.L.R. 270, it was held that where a person owning a homestead brings an action to recover damages sustained because of an unlawful invasion of the homestead rights, the damages recovered in such an action partake of the nature of the homestead property and are also exempt. The facts of the case were that the defendant had a judgment against the plaintiff which the defendant sought to have satisfied by execution and forced sale of the plaintiff's homestead. The homestead property was sold at a judicial sale and as a consequence thereof the plaintiff was deprived of the use of the property and was put to the expense of bringing an action to set aside the levy and sale. After the judicial sale of the homestead had been set aside, the plaintiff brought an action to recover the damages which she had suffered as a result of the unlawful judicial sale of her homestead. The defendants attempted to set off from plaintiff's damages the amount of their judgment which gave rise to the judicial sale. The Supreme Court held that such set off could not be allowed for the reason that the damages suffered by the plaintiff were exempt under the homestead exemption provision of the Constitution. The following statement by the court appears on page 193 of the opinion and is pertinent here:
"It may be said that the Constitution protects homestead property from a `forced sale' only, and that the plea of set-off in this case does not amount to a `forced sale' of plaintiff's exempt property. But such contention would be out of harmony with what the courts almost universally hold to be the object and policy of exemption laws. It ignores the rule of liberal construction to which this court and many other courts are committed."
The court employed similar reasoning and reached a similar result in a subsequent case where the question raised was whether the proceeds of a fire insurance policy due to be paid for destruction of the homestead by fire are exempt from claims of creditors. It was held in Kohn v. Coats, 103 Fla. 264, 138 So. 760, that such proceeds were exempt and were not subject to garnishment. The court in that case recognized that it was committed to a liberal interpretation of the homestead law and stated:
"The reason for the rule [exempting fire insurance proceeds] is that the homestead was provided for the benefit of the exemptor's family, and it may *204 be insured to protect them from loss. The insurance is intended to restore the property in case it is destroyed by fire; those contracting with the exemptor are on knowledge of this fact, and to hold that creditors could seize the proceeds of the insurance policy would give them an advantage they never contemplated would deprive the insured of the means provided to take the place of and restore his homestead."
Although these cases do not decide the point now before us they are valuable precedents in that they shed light on the attitude of this court in similar cases and reflect our predisposition toward a liberal interpretation of the homestead provision of our Constitution.
The policy of the Constitution cannot be misapprehended. Its design and purpose is to benefit the debtor by securing to him his homestead beyond all liability from forced sale under process of any court. The case law of this state dictates that homestead exemption laws should be liberally applied to the end that the family shall have shelter and shall not be reduced to absolute destitution. Bessemer Properties v. Gamble, 158 Fla. 38, 27 So.2d 832; Olesky v. Nicholas, Fla., 82 So.2d 510; Slatcoff v. Dezen, Fla., 76 So.2d 792. Obviously Article X intended to confer valuable rights on the owner of the homestead and was not drawn for the benefit of creditors. However, it should also be kept in mind that "* * * the law should not be so applied as to make it an instrument of fraud or imposition upon creditors". Milton v. Milton, 63 Fla. 533, 58 So. 718.
Turning to the authorities of other jurisdictions on the point of law before us, we find that there is a definite split of authority. See the annotations in 1 A.L.R. 483, supplemented in 46 A.L.R. 814; 40 C.J.S. Homesteads § 71; and 26 Am.Jur., Homestead, Section 48 which states:
"Whether the statute [exempting homesteads] may be invoked for the protection of a fund which has been derived from a voluntary sale of the homestead property is a question which has occasioned a conflict of authority.
"In the absence of statutory provisions to the contrary, the voluntary sale of homestead property is held, in a majority of jurisdictions, to be a complete extinguishment of the homestead right; and consequently, the proceeds of such a sale, until invested in other exempt property, may be subjected to the claims of creditors. While a contrary opinion has been expressed, the claim of homestead is usually held not to be sustainable as to the proceeds of a sale of the homestead, although the sale may have been made by the claimant with the intention of acquiring other property to be used as a homestead. A view sometimes taken is that the proceeds of the sale of a homestead constitute exempt property for a reasonable time pending the investment of the same in another homestead; and such an exemption has been held to be implied by a statute which gives an absolute right to exchange one homestead for another, or to sell the homestead and acquire a new one, which shall be exempt to the same extent as the former one. Likewise, a provision that the debtor may convey his homestead free from all liens has been held to imply the exemption of the proceeds of such sale which are in good faith intended by the debtor to be used in the purchase of another homestead." (Italics supplied.)
Notwithstanding the statement just quoted which indicates that the majority rule is that the proceeds of a voluntary sale of the homestead are not exempt, there appear to be substantial and responsible authorities favoring the minority view that such proceeds are exempt where there is a bona fide intention on the part of the owner of the homestead to reinvest them in another homestead.
*205 The homestead exemption laws of the State of Oklahoma are, with respect to the problem at hand, essentially no different from our own except that there is a $5,000.00 limitation on the value of the homestead protected. In Field v. Goat, 70 Okla. 113, 173 P. 364, 365; 1 A.L.R. 478, it was held that under the rule of liberal construction the exemption of the homestead "must be held to impliedly extend to the proceeds of a voluntary sale of the homestead bona fide intended to be invested in another homestead". (Italics supplied) This principle has since been reaffirmed in the case of State ex rel. Freeling v. Brown, 92 Okla. 137, 218 P. 816.
Under a Kentucky statute which provided for an exemption from sale, execution, attachment or judgment of a homestead not exceeding $1,000.00 in value and which also provided that if the value of the homestead exceeds $1,000.00, the property may be sold and $1,000.00 of the proceeds paid to the debtor to enable him to purchase another homestead, the Kentucky Supreme Court held, in Marcum v. Edwards, 181 Ky. 683, 205 S.W. 798 that these provisions by implication protected from attachment $1,000.00 of the proceeds of the voluntary sale of the homestead. See also Becher v. Shaw, 44 Wash. 166, 87 P. 71.
A similar result has been reached in Kansas, which has homestead provisions similar to our own. Smith v. Gore, 23 Kan. 488, Smith testified that when he received the proceeds from the note and mortgage executed upon the sale of his homestead, he intended to buy another home. The court in its decision stated, "Whether at any time previous to the trial, Smith ever expected or intended to use the money due on said note and mortgage to purchase another homestead, is not shown. The foregoing testimony is all the evidence that tended to show that he ever at any time had any such expectation or intention * * * We think the intention to use the proceeds in procuring another homestead should be formed at or before the time of the sale, and the intention should be to procure another homestead with the proceeds immediately. It would not do to form the intention two years after the sale, nor would a present intention to procure the homestead two years afterward be sufficient. If the party himself supposed that he could get along without a homestead, the law would not protect his money or his credits, and exempt them from the payment of his debts, merely because it supposed he needed a homestead." The court held that although the state homestead-exemption laws are construed liberally Smith had not shown that he was entitled to have the money due on the note and mortgage exempt. It was stated that "The law does not, in express terms, in any case exempt money or credits, merely because they are proceeds of a homestead. They are exempted only by a sort of equitable fiction drawn from the spirit of the homestead exemption laws, and adopted for the purpose of enabling persons to change their homesteads when they desire." A later case, First National Bank of Manhattan v. Dempsey, 135 Kan. 608, 11 P.2d 735, contains the following syllabus by the court: "In a proceeding in garnishment to subject a sum of money due defendant from a third party to the satisfaction of defendant's debt to plaintiff, the evidence tended to show that the money garnisheed was part of the proceeds of the sale of a homestead which the debtor intended to invest in another homestead, and that he had such intention at the time he sold his first homestead, and had not abandoned that intention at the time the garnishment process was invoked. Held, the money was exempt, and the garnishment was properly discharged."
In Iowa the homestead statute specifically provides that the homestead may be sold and a new homestead acquired which shall be exempt from execution to the extent of the value of the old. It is not, however, specifically provided that the proceeds themselves shall be exempt. Nevertheless, the Iowa Supreme Court has consistently held that in order to effectuate the object of *206 the statute, the proceeds collected from the voluntary sale of the old homestead which are intended to be used for the purchase of another homestead and which are not put to an intervening use are exempt while thus in transit from the old homestead to the new. State v. Geddis, 44 Iowa 537; Mann v. Corrington, 93 Iowa 108, 61 N.W. 409; Schuttloffel v. Collins, 98 Iowa 576, 67 N.W. 397; Millsap v. Faulkes, 236 Iowa 848, 20 N.W.2d 40, 161 A.L.R. 1252. See also Watkins v. Blatschinski, 40 Wis. 347. The case of Cullen v. Harris, 111 Mich. 20, 69 N.W. 78, reaches a similar result, but lays down the additional requirement that the fund, in order to be exempt, must be segregated from other monies of the debtor.
A number of the cases alluded to are from jurisdictions where the homestead provisions specifically provide for the sale of the homestead and the acquisition of a new one free from the claims of creditors. It might be urged that this factor should serve as a distinguishing feature between the cases alluded to and the case at bar. However, we perceive no essential difference between the law of our state and that of the states referred to. By the very terms of our constitution, the homestead may be sold with joint consent of husband and wife when that relationship exists. Moreover, there is no question but that a head of a family residing in the state may, after disposing of one homestead, acquire another, which will, upon the satisfaction of all the homestead requirements, be exempt just as the former one was.
After a full consideration of the applicable authorities representing both views on the issue before us, and in recognition of the liberal interpretation of the homestead exemption to which this court is committed, we hold the proceeds of a voluntary sale of a homestead to be exempt from the claims of creditors just as the homestead itself is exempt if, and only if, the vendor shows, by a preponderance of the evidence an abiding good faith intention prior to and at the time of the sale of the homestead to reinvest the proceeds thereof in another homestead within a reasonable time. Moreover, only so much of the proceeds of the sale as are intended to be reinvested in another homestead may be exempt under this holding. Any surplus over and above that amount should be treated as general assets of the debtor. We further hold that in order to satisfy the requirements of the exemption the funds must not be commingled with other monies of the vendor but must be kept separate and apart and held for the sole purpose of acquiring another home. The proceeds of the sale are not exempt if they are not reinvested in another homestead in a reasonable time or if they are held for the general purposes of the vendor.
The homestead exemption provision was not placed in our Constitution for the purpose of tying the owner thereof and his family to a particular home, once established, for the remaining period of their natural lives. It is a protection which should remain inviolate so long as the head of the family who is indebted acts in good faith and with reasonable diligence in converting one homestead into another. In our modern peripatetic society it often becomes necessary for a family to give up its former homestead and move to a new home out of economic necessity or for other compelling reasons. To hold other than we have in the instant case would be to deny to a family finding itself in such circumstances the full benefit of the homestead exemption provision of our Constitution and would be inimical to our declared policy of a liberal construction thereof.
We have considered the early case of Drucker v. Rosenstein, 19 Fla. 191, wherein it was held that the intent of the owner of a parcel of land to build a home thereon and to occupy it as his homestead is not sufficient to invest such land with the character of a homestead and thus put it beyond the reach of creditors. Our present holding is by no means inconsistent with *207 that case. We adhere to the rule that intent alone is not a sufficient basis for the establishment of a homestead. There must first be, as there unquestionably was in this case, property which meets the constitutional requirements of a homestead. In the Drucker case there was never any real property to which the homestead exemption could attach. In the instant case, on the other hand, the appellees had established and maintained a homestead up until the time of the sale. Having done so, the funds realized from such sale enjoy an exempt status provided the other requirements for such exemption as herein set forth are fully met.
The principle established by this decision is akin to the doctrine of equitable conversion, which obtains in this state. Trotter v. Van Pelt, 144 Fla. 517, 198 So. 215, 131 A.L.R. 1018. The funds resulting from the voluntary sale of the homestead are "converted", and while "in transit" assume the character of the exempt real property, dependent, however, upon a bona fide intent of the seller to reinvest such funds in another homestead within a reasonable time. The requirement as to the intention of the seller to reinvest is necessary in order to carry into effect the real, underlying purpose of the homestead exemption as hereinbefore outlined.
It is not for the courts to fix in a case such as this an iron clad inflexible period of time and thereby define reasonable period of time. The question whether funds received from the sale of a homestead are invested in another homestead within a reasonable time must be determined from the facts and circumstances of each case.
Returning now to the facts of the instant case as they are presented to us on this appeal, we are of the opinion that additional evidence should be taken before a proper final decision can be reached. As previously pointed out the only evidence which the trial court had before it was the affidavit of the seller. Although the parties stipulated that the issues should be decided on the basis of this affidavit, we feel that in light of the views expressed in this opinion the parties should be given an opportunity to produce additional evidence on the material points. There appears to be no concrete evidence as to the time within which Mr. LaCroix expects to purchase a new home, nor does it clearly appear that the entire amount of the $6,000.00 now held by the attorneys is needed and is to be used for the purchase of a new home. In this connection it is noted that the affidavit does not reveal the sale price of the former homestead but merely states that its market value was approximately $25,000.00. Moreover, there is no evidence as to what disposition was made of the proceeds of the sale, if any, over and above $6,000.00. If there were other funds coming into his hands as a result of the sale, then it would be an act of bad faith on the part of the seller to place these funds beyond the reach of his creditors in some manner and yet hold the remainder of the proceeds for reinvestment in another homestead.
In order that all the facts may be fully developed and that a decision may be reached in harmony with the views expressed herein, the judgment below is reversed and the cause remanded in the interest of simple justice, for further proceedings in accordance with this opinion.
It is so ordered.
ROBERTS, C.J., and TERRELL and THORNAL, JJ., concur.
THOMAS and DREW, JJ., and ODOM, C.J., dissent.
DREW, Justice (dissenting).
The majority opinion commits this Court to the proposition that it is a judicial function to determine in every instance when a homestead is sold the amount of and extent to which the proceeds derived from the *208 sale are exempt[1] from execution and the length of time which such proceeds shall be endowed with that status. This means that this Court now assumes the power to determine the size and value of a homestead which will be exempt from forced sale under the Constitution when the head of a family sells his homestead and determines to purchase and acquire another.
The validity of these deductions is established from the judgment of the majority in this case which, as I view it, is summarized in the following language extracted verbatim from the opinion itself, viz:
"* * * we hold the proceeds of a voluntary sale of a homestead to be exempt from the claims of creditors just as the homestead itself is exempt if, and only if, the vendor shows, by a preponderance of the evidence an abiding good faith intention prior to and at the time of the sale of the homestead to reinvest the proceeds thereof in another homestead within a reasonable time. Moreover, only so much of the proceeds of the sale as are intended to be reinvested in another homestead may be exempt under this holding. Any surplus over and above that amount should be treated as general assets of the debtor. We further hold that in order to satisfy the requirements of the exemption the funds must not be commingled with other monies of the vendor but must be kept separate and apart and held for the sole purpose or acquiring another home. The proceeds of the sale are not exempt if they are not reinvested in another homestead in a reasonable time or if they are held for the general purposes of the vendor."
Moreover, the majority opinion poses far more questions than it answers. It endows upon what has been aptly referred to as our legal chameleon[2] the additional characteristics of a contortionist and size of a dragon. Now it may not only change colors to meet any environment in which it suddenly finds itself but may take on different shapes to fit into any crevice that might in a particular circumstance be suitable; the size of the crevice may be increased or decreased to fit the size of this legal monstrosity.
I humbly suggest that when the majority opinion is carefully analyzed, it is clear and unmistakably judicial legislation. It recognizes a situation which could result in injury to the family. The result reached is possibly a humane one and, were I a member of the Legislature, I might be persuaded to vote for it even though it must be conceded that, in so doing, I would be closing my eyes to the rights of those to whom money is owed. They constitute not an inconsiderable portion of our population.
*209 My conclusions that mere intention cannot create a homestead status in property and that the remedy for the situation which exists, if it requires remedying, is in the Legislature and not in this Court is not an original idea. The echoes of a unanimous opinion of this Court written more than eighty years ago can clearly be heard.[3] In that case a Florida citizen, when he was insolvent and deeply in debt, borrowed $180.00 and earned $20.00 playing the violin. With this $200.00 he purchased a lot for the sole purpose of making the same his homestead by building a residence thereon and occupying the same with his family consisting of himself, his wife and seven children. He recorded his statement of intention in the public records. Nevertheless, one of his judgment creditors levied against the property. In disposing of the contention that the land constituted the homestead and was, therefore, exempt from execution, the Court made many pertinent observations, among which were the following:
"The almost uniform current of decisions is that actual occupation of property as a home of the family is necessary to impress upon it the character of a homestead. * * *" (text p. 195)
The Court went on to discuss the meaning and scope of the constitutional provision. Inherent in its discussion is the conclusion that to come within the orbit of the constitutional protection, there must be land and some structure thereon suitable for habitation.[4] Justice Van Valkenburgh, writing for the Court, said:
"* * * It is not necessary that a dwelling-house should be upon the premises; he might with his family reside in a tent set upon poles or a cabin erected upon it while building his house, and such occupation would give to it the character of a homestead and protect it under the statute from forced sale.
"While the object of the homestead provisions of the Constitution and law is to protect the debtor and his family in the enjoyment of a home against creditors * * *, yet the property must, when claimed as exempt, be stamped with the character of a home by some circumstance other than the intention to make it so. A bare lot unoccupied cannot be a homestead. Lumber placed upon it for the purpose of building is not such occupancy, even though there may be a contract made for building. The whole claim is based upon the bare declared intention to build a house upon the lot, and the presence of pieces of timber which may be so used when the defendant can find the means to complete it. This debtor, should he enjoin a levy and sale on the ground that he intended to make a homestead on the lot, might do nothing further toward building a house until another levy is made and thereby placing a few more sticks of timber on the lot again claim the homestead exemption on the ground that he was still building or preparing to build a house to be occupied by his family, and in this he may be sincere, but yet the lot is not his homestead within the legal definition of the term.
"It may be said that under the law, as we understand it, a poor man may never be able to obtain a homestead. This may be a defect in the law, but we cannot make laws to supply such defects, if they exist. To hold that this lot is exempt as a homestead, because the defendant intended to make it so at some future time might be defended as an act of mercy, but that is rather the *210 office of the Legislature. It would be difficult to draw the line where exemption begins to attach to unoccupied land if this claim of immunity is allowed.
"If we declare this lot exempt as a homestead, where would the exemption cease to operate if the house was not built or completed?
"Many of the cases decided in other States go far toward protecting property from sale for debts under the homestead laws, but none of them go so far as we would be required to go in this case to exempt this property from sale. It is not a homestead, though the intention may be to make it one at some future time. We believe that the provisions of the homestead laws should be carried out in the liberal and beneficient [sic] spirit in which they were enacted, but care should be taken at the same time to prevent them from becoming the instruments of fraud." (text pp. 198, 199) (Italics theirs).
The keystone of the majority opinion in this case is the intention of the seller to use the proceeds to purchase a new home. For more than eighty years this Court has said that mere intention cannot give even real property the status of homestead. How can it then be logically contended that something so intangible as money can attain that constitutional dignity and status merely by a court looking into the mind of the individual and determining that such intention existed?
The majority opinion holds the proceeds of a voluntary sale are exempt from the claims of creditors if the head of the family "by a preponderance of the evidence" establishes "an abiding good faith intention prior to and at the time of the sale of the homestead to reinvest the proceeds thereof in another homestead within a reasonable time." It next holds that "only so much of the proceeds of the sale as are intended to be reinvested in another homestead may be exempt under [the] holding." These two ukases necessarily mean that one selling his homestead must know exactly how much he is to pay for another home at the time he makes the sale in order that the proceeds may be exempt, a premise that in many cases from the standpoint of a creditor would be impossible to refute. Moreover, the majority opinion holds "[a]ny surplus over and above that amount should be treated as general assets of the debtor." How is the creditor to know what amount may be subject to attachment or levy; how is he to know when it may be subject to attachment and levy; how is the homestead owner to know how long he has to reinvest the proceeds in another home; what is to become of the rights of the creditor if the homestead owner decides to abandon his "abiding good faith intention" and remove himself and proceeds to another state; is the seller to be the sole arbiter of how much of the sale is to be exempt merely by a mental process of determining how much of the proceeds of the sale he will reinvest in another homestead; is a reasonable time the same in all instances or is it different for different people and, if it is different under different circumstances and for different people, does this operate within the constitutional requirement of equal protection of the laws; what happens to the liabilities of an honest and diligent creditor who attaches such proceeds and thereafter the Court determines that "reasonable time" has not elapsed for the owner to reinvest the same or the creditor has attached too much; what is the meaning of the words "the funds must not be commingled with other monies of the vendor but must be kept separate and apart and held for the sole purpose of acquiring another home"?
These unanswered questions could be readily solved in the legislative forum of Florida by rules applicable to all and with uniform provisions and limitations as has been done in other states but, in my judgment, we are creating a serbonian bog in which we will become inextricably mired *211 by attempting to do that judicially which should be done legislatively. Let us now look more closely at this particular case and the authorities of this and other states on the subject.
The affidavit which formed the factual basis for the entry of the final decree in this case for the purpose of a clear understanding of the discussion which will follow hereafter is contained in the footnote.[5]
In addition to the reasons to which I have alluded above, I am firmly convinced that the great weight of authority in this Country is contrary to the opinion and judgment of the majority in this cause and, while I will not undertake to discuss all of the cases cited in support of the view of the majority, I mention here, as I do later in the opinion, the fact that the different language used in the constitutions of the various states when taken in connection with other provisions of the same constitutions and the legal philosophy of the courts of other states constitute little precedent for the determination of the point under consideration here. I pronounce here, as I reiterate later in the opinion, the fact that our own Constitution and our own decisions are largely determinative of the question and that, while it might be well for the Legislature to consider the question under discussion and perhaps provide some method by which the results reached by the majority opinion may be accomplished, such has not been done in over eighty years although many, many sessions of the Legislature have come and gone since Mr. Justice Valkenburgh spoke as he did in 1882.
*212 The question presented and here restated is whether the proceeds derived from the voluntary sale of homestead property are exempt from forced sale and, if so, the extent of such exemption. In several cases this Court has discussed various aspects of this question, but I find no case which would be determinative of the issue squarely presented in this case, although many cases, in my view, clearly point the way to the solution.
The subject provision of the Constitution has been a fruitful source of litigation in this State and the many decisions which have been rendered construing it have been the source of much comment.[6] In spite of the plethora of cases, however, I repeat that research reveals none that have directly decided the point presented in this case. Moreover, in an exhaustive study and analysis of decisions from other states, I have found no uniform judicial thinking upon the subject. The weight of authority, however, is that the purchase price of a voluntary sale of homestead property is not exempt from the claims of creditors in the absence of express statutory provisions authorizing such exemption.[7] American Jurisprudence observes:
"In the absence of statutory provisions to the contrary, the voluntary sale of homestead property is held, in a majority of jurisdictions, to be a complete extinguishment of the homestead right; and consequently, the proceeds of such a sale, until invested in other exempt property, may be subjected to the claims of creditors."[8]
Corpus Juris Secundum, in discussing whether the proceeds in a voluntary sale are exempt from forced sale, deals primarily with the discussion of statutes which limit or circumscribe the proceeds from a voluntary sale but contains the following observation:

"As determined by the statutory provisions, the proceeds of a voluntary sale of a homestead may be exempt in all circumstances, or not exempt, or unconditionally exempt for a designated period, or exempt, for a designated or reasonable period, if intended for reinvestment in another homestead."[9] (Italics supplied).
As a careful study of these texts and the annotations above referred to reveal, there are states which hold that in the absence of a statutory provision fixing the period within which an investment in a new homestead must be made, a reasonable time will be allowed therefor during which period such proceeds are exempt from execution.[10]
It is exceedingly difficult, however, to relate the applicability of these cases to the situation presented by our particular constitutional provision or that of other states because in a great many instances the courts, in deciding these cases, most of which are quite old, have not recited the pertinent constitutional or statutory provisions which vary to a great extent in many states. For instance, in the annotation appearing in 1 A.L.R. 484, in discussing a Missouri case, the annotator states "* * the court states arguendo that the statutes which are not set out, recognize the right to sell one homestead and purchase another with the proceeds." (Emphasis supplied). In Kentucky there appear to be a number of cases which apparently support the view *213 that proceeds of the homestead are exempt, at least while being held for a reasonable time, for reinvestment in another homestead. The appellant in its brief discusses these Kentucky cases and refers particularly to Marcum v. Edwards, 181 Ky. 683, 205 S.W. 798 (1918), which is relied upon strongly by appellees to support the theory of exemption. Appellant sets forth a Kentucky Statute #1705 (now Section 427.090) which, it says, was in force in 1918 at the time of the Marcum case and which contains a specific provision that "One thousand dollars, of the money arising from the sale shall be paid to the [debtor] to enable him to purchase another home." The judgment in the Marcum case was for $1,000.00, therefore bringing into direct play the statutory provision of Kentucky above referred to. This statute sheds light upon the apparent generality of the judicial assertion of the Kentucky court to the effect that the proceeds of such voluntary sale were exempt. With reference to these Kentucky cases, the annotator in 1 A.L.R., supra, has stated "* * * but the value of these cases as precedents is impaired by the failure of the reports to disclose the terms of the Homestead Statute in this regard, or whether or not there were any express provisions as to the exemption of proceeds."
Turning now to our own cases which have dealt with various phases of the question, although not the direct question itself, the statement by Mr. Justice Whitfield in the case of Norman v. Kannon,[11] is quoted below:

"If a permissible conveyance of a homestead for a proper consideration is duly made, the consideration takes the place of the exempted property and the Constitution may not thereby be violated. Such conveyances of homesteads serve the public policy of a limited exercise of the natural right of alienation and preserves the organic homestead exemption for the protection of the family." (Emphasis supplied).
A number of cases[12] are cited in support of the above quoted language but they do not lend support to the italicized portion of the opinion when taken out of context with the remaining part thereof. The case from which the above quotation is taken decided the question of whether a homestead may be conveyed by husband and wife without consideration to a third person and immediately thereafter reconveyed back to husband and wife as tenants by the entirety, thereby defeating the rights of the children in the homestead itself. This was the only point involved. The court held in this case that such conveyance was ineffective for such purpose. Reverting back, however, to the italicized portion of the quoted language above, each of the cases cited in support thereof dealt with a similar situation, namely the requirements of the Constitution with reference to the formalities which must be observed by husband and wife in the alienation of such homestead. For instance, in the Byrd case, the holding merely was that the conveyance of the homestead real estate to the wife executed by the husband alone was void. In the Hart v. Gulf Fertilizer case the facts were somewhat complicated. The court there held that an owner may alienate his homestead as provided by the Constitution without making it subject to a previously acquired judgment. It did not deal with the question of whether the proceeds derived from the sale were subject to attachment or garnishment or other process. Wright v. Wright dealt with the question of the requirements of the Constitution as to the method of acknowledgment by the wife. Shad v. Smith again emphasized that any attempt to convey the homestead without the strict observation of the constitutional *214 provisions rendered the instrument void. So it is that the portion of the statement which I have italicized cannot be taken as authority for the proposition that the proceeds of the sale, taking the place of the homestead itself, are exempt from attachment, garnishment or other process. Moreover, such italicized portion is obviously now judicial obiter being wholly unnecessary to the decision in that case.
Norman v. Kannon, supra, was decided in 1938. In 1943 this Court, speaking through Mr. Justice Terrell in the case of Richards v. Byrnes, 153 Fla. 705, 15 So.2d 610, was dealing with the question of whether furniture in a homestead of a value in excess of $1000.00 was a part of the exempt homestead. In that case the appraisement showed that furnishings in the residence on the homestead were appraised at $7959.50. In holding that the Constitution limited the value of the furnishings to $1000.00, the Court said:
"It is quite true that this Court has repeatedly held that the homestead laws should be liberally construed in the interest of the family. We do not depart from this holding; at the same time the content of the homestead cannot be construed as extending beyond the plain words of the Constitution creating it. Section One of Article Ten limits it to 160 acres of land, or the half of one acre in an incorporated city or town owned by the head of the family residing in this State together with one thousand dollars worth of personal property and the improvements on the real estate."
"The personal property may be in cash, furnishings, or any other personalty owned by the head of the family at his death but cannot exceed in value more than one thousand dollars and may be designated by the court something after the manner provided in Sections 222.07 and 222.08, Florida Statutes of 1941, F.S.A. * * *"[13] (Emphasis supplied).
In 1949 this Court decided Olsen v. Simpson.[14] In this case appears the most direct answer to the question found in any of the reported cases although it could be argued that the language used is obiter. Nevertheless, what was said there was the basis upon which the decree of the trial court, holding certain proceeds of the voluntary sale of an alleged homestead to be exempt, was reversed. Without burdening this opinion with a recitation of the facts in that case, the Court, speaking through Mr. Justice Barns, observed at page 803, with reference to the proceeds of the sale of the property in that case alleged to be homestead:
"* * * it seems that the wife is the judgment creditor of the husband and that the husband's share in the proceeds of the sale is subject to the satisfaction of the judgments held by the wife.
"The property is now personalty, * * *."
Following the last sentence the homestead provision of the Constitution is quoted followed immediately by the quotation:
"We are faced with the question as to whether or not the defendant husband is the head of a family. If so, he is entitled to a homestead exemption of `one thousand dollars worth of personal property.'"
The last sentence preceding the judgment in that case is the following:

*215 "* * * The appellant's interest lost its character as `land' when the sale became fully effective." (Emphasis supplied).
I think the answer to the question posed in this appeal, in spite of the confusion and the many diverse holdings in other states, is found not only in Drucker v. Rosenstein, supra, but in the plain language of the Constitution itself. I re-emphasize here what was said by Mr. Justice Terrell for the Court in Richards v. Byrnes, supra:
"* * * the content of the homestead cannot be construed as extending beyond the plain words of the Constitution creating it. * * *"
At the time the Constitution was written in 1885, the people were dealing primarily with an agricultural economy. In numerous decisions in this and other courts we and they have held that the purpose of inserting in the Constitution similar provisions to our Section 1 of Article X was the protection of the family home and its contents and the family itself. When a voluntary sale of a homestead has been made by husband and wife in the manner provided by the Constitution itself and in accordance with the decisions of this Court which have so strictly construed these provisions, the proceeds become personal property and no longer partake, either in the spirit or letter of the Constitution, of the characteristics of the homestead intended to be protected by the Constitution. Such proceeds then become personalty and are protected from forced sale to the extent of the value of $1000.00 specifically mentioned in the Constitution. This Court, in Richards v. Byrnes, supra, held specifically that such could consist of cash. So far as this provision of the Constitution is concerned, there can be no distinction between the head of a family who sells his homestead for cash and his neighbor, likewise the head of a family, who does not own a homestead but has the same amount of cash. A simple example will illustrate the fallacy of the idea that the whole proceeds of a voluntary sale of the homestead are exempt from forced sale. A and B reside in homes adjacent to each other of the same size and value. Both are the heads of a family. A owns his property while B rents his. A voluntarily sells his homestead for $X and receives it in cash with the intention of buying another home. B has saved $X over the years to purchase a home. Under the theory that the proceeds of the sale are exempt, A's $X would be exempt from forced sale while B's would not. Such an obviously fallacious interpretation is absurd.
Neither Kohn v. Coats[15] nor Hill v. First National Bank[16] are authority for the proposition urged by appellee that the proceeds of the subject sale are exempt. While both cases hold that the homestead exemption should receive a liberal interpretation, a careful analysis demonstrates that both are entirely inapplicable to the present situation. Both cases present the outer limits of exemption. Nevertheless, the conclusion in each does not unjustifiably stretch the purpose and meaning of the constitutional provision. Hill v. First National Bank, supra, (the basic authority for Kohn v. Coats) was simply a case where this Court held that a judgment creditor could not do indirectly that which the Constitution prohibited him from doing directly. This is clearly established by the example of the cow and a calf in the opinion. The Court observed, 84 So. at page 193, with reference to a prior unlawful execution sale by the bank:
"* * * This cow and calf were sold and were never returned to plaintiff. Suppose that instead of one cow and calf taken, there had been taken twenty cows of the aggregate value of $400, and that such cows had been sold and not returned to plaintiff just as the one cow and calf were. Plaintiff *216 clearly would have been entitled to recover the value of such cows because of the unwarranted conversion of them, the court having previously held them exempt from forced sale because of their character as homestead property. * * *
"* * * In this case it would give to defendants the fruits of a `forced sale' although such sale was illegal and therefore wrongful. It would permit defendants to do indirectly what they are enjoined from doing directly, and thereby defeat the beneficial purpose of the law. * * *"
This case was decided in 1920. More than ten years later in Kohn v. Coats this Court held that the proceeds of an insurance policy representing the value of a destroyed homestead were exempt from forced sale. We did so under the theory that it was an involuntary conversion and
"* * * The insurance is intended to restore the property in case it is destroyed by fire; those contracting with the exemptor are on knowledge of this fact, and to hold that creditors could seize the proceeds of the insurance policy would give them an advantage they never contemplated would deprive the insured of the means provided to take the place of and restore his homestead."
Kohn v. Coats is in accord with many decisions holding that the proceeds of an involuntary sale such as by condemnation or as in that case by destruction by fire are exempt from forced sale.[17] It must be borne in mind that so far as Kohn v. Coats is concerned, the home and furnishings which were destroyed represented only a part of the homestead. The land was still intact so it cannot be said in that case that there was any voluntary alienation nor that the homestead had been abandoned voluntarily or otherwise.
In summary, therefore, I would hold that where there is a voluntary sale of homestead property, the proceeds of such a sale become personal property and are not exempt from forced sale or other process under Article X, Section 1 of the Florida Constitution, except to the extent of $1,000.00 and then only when such exemption is duly claimed in accordance with the applicable statutes.[18]
I, therefore, respectfully dissent.
THOMAS, J., and ODOM, C.J., concur.
NOTES
[1] The pertinent provision of the Constitution is Section 1, of Article X which reads as follows:

"§ 1. Exemption of homestead; extent.  A homestead to the extent of one hundred and sixty acres of land, or the half of one acre within the limits of any incorporated city or town, owned by the head of a family residing in this State, together with one thousand dollars worth of personal property, and the improvements on the real estate, shall be exempt from forced sale under process of any court, and the real estate shall not be alienable without the joint consent of husband and wife, when that relation exists. But no property shall be exempt from sale for taxes or assessments, or for the payment of obligations contracted for the purchase of said property, or for the erection or repair of improvements on the real estate exempted, or for house, field or other labor performed on the same. The exemption herein provided for in a city or town shall not extend to more improvements or buildings than the residence and business house of the owner; and no judgment or decree or execution shall be a lien upon exempted property except as provided in this Article." (Emphasis supplied).
[2] A most thorough review of these cases appears in the article by Harold B. Crosby and George John Miller entitled "Our Legal Chameleon, The Florida Homestead Exemption: I-III," University of Florida Law Review, Spring to Fall, 1949, Vol. II, #3, pp. 12 to 84 inclusive. Particularly see PP. 77 et seq.
[3] Drucker v. Rosenstein, 19 Fla. 191 (1882).
[4] This, of course, does not have reference to the provision for the exemption of $1000.00 of personal property which is referred to and discussed later in the opinion.
[5] "COUNTY OF ORANGE

"STATE OF FLORIDA
"AFFIDAVIT
"I, Henry J. LaCroix, having first been duly sworn upon oath by the undersigned officer, depose and say as follows:
"1. That I am one of the Defendants in the above styled cause and the other Defendant, Helen P. LaCroix, is my wife.
"2. That on the 22nd day of May, 1959, and for approximately three and one-half (3-1/2) years prior thereto my wife and I owned Lot 3, Stonehurst Estates as per plat thereof, recorded in Plat Book ____, Page ____, of the Public Records of Orange County, Florida. Said property is located in Orange County outside the corporate limit of any municipality. Said property is less than one-half acre in size. The street address of said property is 1807 Stonehurst Drive, Winter Park, Florida.
"3. Located upon said property is a single family residence and on the aforesaid date and during the aforesaid period my wife and I resided upon said property with our children, Patricia B. and Henry J. LaCroix, Jr. During all said time we have continuously resided in Florida and on said property with the intention of making Florida our permanent home.
"4. During the latter part of 1958 and the early part of 1959, I was self-employed in the business of constructing houses and the business failed to prosper and it was necessary that I discontinue said business at a time when I was heavily indebted. As a result of business failure, it became necessary for me to sell the above described property because I could no longer afford to maintain a house as large and as expensive. Said house had a market value of approximately $25,000.00 and an area of 2,000 square feet. In July I listed the house for sale with the intention of selling it and purchasing a smaller and less expensive home for my family. On the 15th day of July, 1959, I entered into a contract to sell the house and the transaction was closed on July 22, 1959. The attorney for the purchaser in examining title on said property discovered the judgment of record in the amount of $5,972.18 obtained by Orange Brevard Plumbing & Heating Company against me and my wife and withheld the sum of $6,000.00 from the proceeds of the sale pending a determination that the property was homestead on date of said sale.
"5. On the date of the sale and on date of the closing my wife and I were residing on the property and continued to reside there until approximately August 15, 1959, when we rented a house at 514 Dunblane Street, Winter Park, Florida, where we intended to reside until we could find a suitable house to purchase for our home.
"I intended to purchase a home with the funds in the hands of Winderweedle & Hunter when they are paid to me.
"Further affiant sayeth not.
"Henry J. LaCroix"
[6] See supra note 2.
[7] See the annotations beginning on page 483 of 1 A.L.R. following Field v. Goat, 70 Okla. 113, 173 P. 364 (1918), 1 A.L.R. 478, et seq.; also the supplementary annotations in the footnote following Smith v. Hart, 49 S.D. 582, 207 N.W. 657 (1926), 46 A.L.R. 811 (annotation beginning page 814).
[8] 26 Am.Jur. Homestead, Sect. 48 (1940).
[9] 40 C.J.S. Homesteads § 71 (1944).
[10] See 40 C.J.S. § 71, supra, and the cases cited in footnotes numbered 24, 25 and 26.
[11] 133 Fla. 710, 182 So. 903, 905 (1938).
[12] Hart v. Gulf Fertilizer Co., 91 Fla. 991, 108 So. 886 (1926); Byrd v. Byrd, 73 Fla. 322, 74 So. 313 (1917); Wright v. Wright, 75 Fla. 7, 77 So. 616 (1918); Shad v. Smith, 74 Fla. 324, 76 So. 897 (1917).
[13] These statutes appear to be applicable to the current question. They now appear under Title XIV Florida Statutes 1959 entitled "Homestead and Exemptions." F.S.A. The present provisions which seem applicable to the current question are Sections 222.06 et seq. While obviously this chapter deals with all exemptions which may be allowed by law without specifically mentioning the homestead exemption, its mechanics are clearly applicable to this $1000.00 personal exemption under the Constitution.
[14] 39 So.2d 801 (Fla. 1949).
[15] 103 Fla. 264, 138 So. 760 (1931).
[16] 79 Fla. 391, 84 So. 190, 20 A.L.R. 270 (1920).
[17] Hutcheson v. Hutcheson, 176 Tenn. 468, 143 S.W.2d 886 (1940); White v. Fulghum, 87 Tenn. 281, 10 S.W. 501 (1889); First National Bank of Scottsville v. Duncan, 210 Ky. 777, 276 S.W. 848 (1925); Franklin Fire Ins. Co. v. Butts, 184 Ark. 263, 42 S.W.2d 559, 563 (1931); Thompson-Ritchie & Co. v. Graves, 167 La. 1024, 120 So. 634, 635, 63 A.L.R. 1283 (1929); Albrecht v. Albrecht, N.D., 99 N.W.2d 229 (1959); Goldberg v. Salyer, 188 Va. 573, 50 S.E.2d 272 (1948).
[18] In Lane v. Richardson, 1889, 104 N.C. 642, 10 S.E. 189, the North Carolina Court said, with reference to the same question under a very similar constitutional provision:

"* * * The answer is that when Harriss sold his homestead he converted it into personal property, which became the subject of the personal property exemption, while the land retained the quality of the homestead exemption in the hands of the purchaser."